ESTATE OF GEORGIA T. O'KEEFFE, DECEASED, RAYMOND R. KRUEGER, PERSONAL REPRESENTATIVE, JUAN HAMILTON, PERSONAL REPRESENTATIVE, AND JUNE O'KEEFFE SEBRING, PERSONAL REPRESENTATIVE, Petitioner, v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of O'Keeffe v. Commissioner
Docket No. 18344-90
United States Tax Court
T.C. Memo 1992-210; 1992 Tax Ct. Memo LEXIS 228; 63 T.C.M. (CCH) 2699; April 8, 1992, Filed *228 Decision will be entered under Rule 155. Joseph E. Earnest, R. Donald Turlington, Robert P. Worcester, Eileen Caulfield Schwab, E. Michael Bradley, and Judith Welcom, for petitioner. Deborah A. Butler, George E. Gasper, and James E. Archie, for respondent. COHEN
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge. Respondent determined a deficiency of $ 6,014,493 in the estate tax of the estate of Georgia T. O'Keeffe, deceased (O'Keeffe). After concessions, the issue for decision is the fair market value after application of the appropriate blockage discount of O'Keeffe's works left in her estate at the date of death. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect at the date of death, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT O'Keeffe died on March 6, 1986, at the age of 98. At the time of her death, there remained in her estate approximately 400 works or groups of works of art that she had created. The total of the individual fair market values of each of O'Keeffe's works in the estate as of the date of death exceeded $ 72,759,000. *229 If, however, all or a substantial portion of those works had been simultaneously offered for sale on the date of death, the availability of such a large block of O'Keeffe's works would have depressed the price to be paid for each of the individual works. The fair market value of the aggregate of the works in the estate, therefore, as of the date of death, was substantially less than the total of the fair market values of each individual work. The amount of the discount (the blockage discount) to be anticipated with respect to each work of art in the collection, however, would depend on the market for that work or works of the type represented by that work. In order to determine the appropriate discount for particular segments of the aggregate, therefore, it is necessary to examine the history of the market for O'Keeffe's works, the prospects for the market for O'Keeffe's works as of the date of death, the types of works to be valued, and the art market in the United States. O'Keeffe in Retrospect
O'Keeffe began painting in 1914. Her work was first exhibited in 1915 at the 26th Annual Exhibition -- New York Watercolor Club. Subsequent to that show, her works were exhibited *230 at numerous galleries, museums, and shows on a regular basis. O'Keeffe rose to prominence in the 1920s, initially through the efforts of Alfred Stieglitz (Stieglitz), her husband. Critical acclaim for O'Keeffe's work was high in the 1920s and 1930s, the period during which she produced her popular signature large flower paintings. Until 1946, when Stieglitz died, he controlled distribution of O'Keeffe's works into the marketplace. O'Keeffe became one of the best known American artists of the period between the two World Wars. Although she lived well past the post-War period and became a celebrity, the bulk of her work, as well as her reputation among art dealers and critics, was based on her connection with early Modernist painting in America. After the death of Stieglitz, O'Keeffe selected certain dealers to sell her works on her behalf. Whether she sold through an agent or directly, O'Keeffe imposed strict conditions and guidelines regarding the hanging and framing of her works, how often they were to be lent and to whom, and their subsequent dispositions. She frequently required that paintings either be resold to her or given to a museum. In 1970, a major exhibition of *231 O'Keeffe's works was held at the Whitney Museum of American Art in New York, then traveled to Chicago, Illinois, and San Francisco, California. Five of O'Keeffe's works were offered for sale at Sotheby Parke Bernet Inc. or its predecessors (Sotheby's) in 1970, and four of her works were offered for sale at Sotheby's in 1972. One of the dealers used by O'Keeffe was Edith G. Halpert (Halpert) of the Downtown Gallery. In March 1973, an auction of works from the estate of Halpert was conducted by Sotheby's. That auction included 12 works by O'Keeffe that had been painted throughout 41 years of her career, 1914 to 1955, that represented all of her media -- charcoal, pastel, watercolor, and oil -- and that presented the range of her canvas size. The works sold at the auction brought strong prices, including $ 120,000 for an oil painting entitled Poppies, which had been painted in 1950. One hundred twenty thousand dollars was a large and unexpected price for an O'Keeffe painting in 1973. In the summer of 1973, O'Keeffe met Juan Hamilton (Hamilton), a sculptor who was working as a handyman in the area of O'Keeffe's home in New Mexico. Thereafter and until the time of her death, Hamilton *232 assisted and advised O'Keeffe in the promotion of her art. In 1976, O'Keeffe had published a luxurious book that included photographs of her best works. The book increased the marketability of her best works. In 1977, a major television documentary film featuring O'Keeffe and characterizing her as a living legend was made. In about 1978 or 1979, a book and exhibit of Stieglitz portraits of O'Keeffe stimulated interest in her and her art. Sales of O'Keeffe's works in the late 1970s and early 1980s increased, partly as a result of a generalized boom in the art market and partly because of a more aggressive personal sales approach taken by O'Keeffe. In 1979, the average price of a work sold by O'Keeffe jumped from tens of thousands of dollars to $ 121,000. The average price of paintings O'Keeffe sold personally rose to a high of $ 631,250 in 1983. At the date of O'Keeffe's death, she and Hamilton were working on a major exhibition of her art to be held at the National Gallery of Art in Washington, D.C. In connection with that exhibition, a catalogue of her work was published in 1987. At the date of her death, O'Keeffe had produced between 1,100 and 1,200 substantial works. *233 The market for her works was essentially limited to the United States. The total dollar values of sales reported by the major auction houses, Sotheby's and Christie's of New York, for works by O'Keeffe, for the period 1979 to 1991, were: 1979
$   196,500
1980
1,100,000
1981
152,500
1982
400,000
1983
420,000
1984
1,005,000
1985
1,200,000
1986
410,000
1987
8,260,000
1988
715,000
1989
4,405,000
1990
2,905,000
1991
575,000
O'Keeffe's works were also sold through galleries, although exact data concerning such sales is difficult to obtain or to verify. From 1979 through 1986, one gallery sold 16 of O'Keeffe's works on canvas, 24 works on paper, 1 work on wood panel, and 4 sculptures. The prices received for the works on canvas ranged from $ 60,000 to $ 1,000,000. The prices received for the works on paper ranged from $ 6,000 to $ 120,000. From 1978 to 1991, another gallery sold in excess of 100 of O'Keeffe's works. Approximately 25 works were sold for prices of $ 500,000 and above, and 5 works were sold for prices over $ 1,000,000. Approximately 28 works were sold at prices between $ 200,000 and $ 499,999. O'Keeffe was able to transcend her traditional market, *234 collectors of American Modernism, and appeal to a far broader range of buyers. The buyers to whom her works appealed included art collectors and persons who enjoyed the beauty of her pictures, the fascination of her myth, and the subject of her pictures. O'Keeffe's diverse range of subject matters, such as flowers, trees and leaves, landscapes (New Mexico and New York), and abstractions (early and late), and her various "periods" appealed to different segments of the public. The market for O'Keeffe's works included small and large museums that bought the works or sought donors for the works, private collectors, and the general public. Her works appealed to those who collected American "modern" art as well as those who simply liked what she painted. Works in the Estate
The works of significant value in the estate at the date of O'Keeffe's death ranged from early works on paper through works on canvas done in the 1970s. The estate included many major paintings of flowers, abstracts, and landscape subjects from the 1920s and 1930s and many large and important works from later periods, including western landscapes and abstractions from the 1940s, 1950s, and 1960s. The estate *235 included paintings in series, including the Jack-in-the-Pulpit series, Abstraction series, White Rose series, Charcoal Drawing series, From a Day with Juan series, In the Patio series, It was Yellow and Pink series, Nude series, Series I series, Shell and Old Shingle series, Special series (drawings), and Yellow Horizon and Clouds series. Certain series by O'Keeffe, for example, the Jack-in-the-Pulpit, the Clouds, and the In the Patio series, are sought after by collectors and are highly esteemed in the marketplace. Three works in the Jack-in-the-Pulpit series had individual fair market values of $ 1,500,000, and one had an individual fair market value of $ 1,800,000 at the date of O'Keeffe's death. The paintings that are part of a particular series show the differences in O'Keeffe's technique in the treatment of medium, light, form, and perspective of one theme and show O'Keeffe's progression as an artist. The paintings that are part of a series are an essential part of her lifetime output and will often have a value greater than the value each would have if it were not part of a series. O'Keeffe's will, executed in 1979, a codicil, executed in 1983, and a settlement agreement, *236 entered into in 1987 resolving litigation over the estate, provided for the distribution of 42 of O'Keeffe's works to 8 museums. The works distributed to the museums had individual values ranging from $ 40,000 to $ 1,800,000 and a total value of $ 22,575,000. As a result of the settlement agreement, five additional works were transferred to the Museum of New Mexico and the University of New Mexico. The Art Market in the United States
From 1979 to 1986, with the exception of the 1982 recession, the art market in the United States experienced a boom period, with the values of individual works of art rising dramatically over those years. Increased market activity and competition drove up the prices of works of art. The relatively low prices for American art, and specifically for early American Modernism, caught the attention of the general art market. Consequently, between 1979 and 1986, prices for American art generally increased severalfold. In 1986, the art market in the United States was strong. The Sotheby's auction in 1987 occurred at the peak of the art market boom. By 1986, it had become apparent to knowledgeable dealers and collectors that the art market, particularly *237 the highly inflated market for American art, had grown so fast that it was becoming unstable and unreliable. A dealer could still make a profit on the quick turnover of individual works, particularly on outstanding examples of an individual artist's work. Knowledgeable dealers and collectors, however, would have approached with caution the purchase of a large block of works of mixed quality identified with early American Modernism, such as those in the estate. Appraising, buying, or selling a large group of works by a single artist is considerably different from appraising, buying, or selling a single work. This difference is a result of the nature of the art market. The market for works of art that sell at the relatively high values of the works in the O'Keeffe estate is limited. Popularity among persons seeking to decorate with art is not necessarily a reliable index of market strength or breadth. Potential purchasers of large groups of works are dealers, collectors, and institutions with interest and substantial funds to disburse. The art market, however, is different from, and less secure than, financial markets. A work of art usually does not have intrinsic financial *238 value beyond its desirability as art and lacks external indicia of return prior to resale, such as earnings or dividends. Individuals and institutions interested in purchasing art, therefore, tend to rely on the principal dealers or collectors in a particular market for advice and on the perceived security of purchasing the type of art that is most in demand, or is most fashionable, at the time. Particular key dealers and collectors become identified with different specific markets within the general art market. When considering a purchase or sale of a large number of works by an individual artist, a purchaser for investment would consider the potential involvement of those dealers and collectors. Without both the involvement of those key dealers or collectors and a current broad appeal among art patrons capable of investing at the level required, it is exceedingly difficult to sell a large group of works. Particular individual works may appropriately be valued at high levels. When considering the works of a specific artist, a dealer must look within the general art market to the specific markets that support the value of the artist's work. With regard to the O'Keeffe market, *239 the dealer distinguishes not only between the markets for European and American artists but also between the markets for pre-World War II and post-World War II American art. The market for European artists is substantial and worldwide. The market for post-War American art by the outstanding American artists of the latter half of the 20th century -- artists such as Pollock, Rothko, de Kooning, and Johns -- is also substantial, although not as large as the market for European artists such as Picasso, Miro, and Chagall. The post-War market is populated by numerous dealers and collectors who support and facilitate that market. By contrast, the market for early American Modernism, into which dealers classify O'Keeffe's works, is narrower with fewer key dealers and collectors to support it. According to records maintained by the Art Sales Index and ArtQuest, the number of sales of artwork at auction at a price in excess of $ 500,000 for 1986 through 1990 was as follows: 1986
157
1987
351
1988
526
1989
1,086
1990
856
Art Expert Opinions
The estate employed Eugene Victor Thaw (Thaw) to appraise O'Keeffe's works in the estate for the Federal estate tax return and *240 for trial of this case. Thaw had been involved in all aspects of the art market since 1950. He was well qualified to appraise the works of O'Keeffe. Thaw had testified as a witness on the blockage discount appropriate in the Tax Court case of , affd. . The Smith case was the first litigated case to apply a blockage discount to works of art. In Thaw's opinion, however, there was no similarity between the content of the Smith estate and the content of the O'Keeffe estate except that the two cases were tried in the Tax Court. The individual values of all of O'Keeffe's works in the estate were determined by agreement between Thaw, on behalf of petitioner, and the Internal Revenue Service (IRS). It was Thaw's opinion that the appropriate blockage discount that should be allowed for O'Keeffe's works in the estate on the date of death is 75 percent. Thaw's opinion was based on the understanding and assumption that all of the works in the estate would be sold to a single buyer as a bulk purchase, which would require a syndicate of investors. The hypothetical buyer *241 would have to hold the works for many years and, in determining the price to be paid, would take into account interest, selling costs, promotion, maintenance costs, and carrying charges. Thaw also based his opinion on the assumption that a buyer would consider "fluctuations from the very high market plateau for O'Keeffes in 1986", although he would have advised a potential buyer that prices of works by O'Keeffe, on average, were unlikely to go down. Thaw would not, however, have advised a hypothetical seller of the works in the estate to sell the total of those works at a 75-percent discount. Thaw was under the impression that determination of blockage discount required him to assume a hypothetical buyer on the date of death who would have been required to purchase all of the works of the estate in bulk on that date. Although Thaw's written report categorized the works in the estate by medium and price, he did not differentiate among the works in determining the discount to be applied. Barbara Rose (Rose), an art historian who had assisted O'Keeffe in relation to the publication of the 1976 book, also prepared a written report on behalf of petitioner. Rose identified traditional *242 factors establishing value in the art market as rarity, quality, size, subject matter, medium, and condition. With reference to O'Keeffe's works, she identified lack of scholarly reviews or a catalogue raisonne, the "mystical and religious content of her art", and prejudices of sex, age, and provincialism as negative factors. Rose concluded that a bulk sale of O'Keeffe's works on the date of death would have resulted in a two-thirds to three-fourths loss in value. Rose, however, would not have advised a seller to sell O'Keeffe's works in bulk on the date of death at the discounted value. Rose's opinion was based in part on her view that many of O'Keeffe's works in the estate were in poor condition. Warren Adelson (Adelson), a dealer in American art, prepared a written report on behalf of respondent. Adelson divided the art into two categories, "Bequested Art" and "Remaining Art". Adelson assumed and understood that: Blockage discounts have been applied to recognize the impact of a huge number of works of art coming on the market at the same time, thereby disrupting the normal economics of supply and demand. Clearly blockage is applicable to works of art that are for sale, *243 works that impact the marketplace. It is not applicable to works which are unavailable for sale, in this case, bequested works.
The total value of the 80 pieces of "Bequested Art" for which Adelson did not determine a blockage discount was $ 32,228,000. With respect to the "Remaining Art", Adelson noted that the 72 most valuable items totaled $ 30,975,000. He opined that these pieces could be sold "within a few years"; he determined "only a nominal discount" of 10 percent for those 72 items. In his opinion, a blockage discount of 37 percent would be "fair and reasonable" for the other 177 pieces that would "take years, perhaps a decade, to dispose of." OPINION The expert reports and the testimony at trial comprise hundreds of pages, containing much repetition, inconsistency, and interesting, but immaterial, information. We do not set forth such details here. We have considered all of the testimony and the exhibits, and the facts set forth above are those necessary to understand our conclusions. Property includable in a decedent's gross estate is generally included at its fair market value on the date of the decedent's death. Sec. 2031(a). Fair market value is the *244 price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or to sell and both having reasonable knowledge of relevant facts. ; sec. 20.2031-1(b), Estate Tax Regs. The parties in this case agree that the total of the individual fair market values of each of O'Keeffe's works in the estate exceeded $ 72,759,000 on March 6, 1986. They disagree, however, as to the appropriate blockage discount to be applied to the total. In our view, the disagreement is in large part the result of erroneous instructions to the experts with respect to the concept of blockage. As we said in : If the parties fail to provide the experts with complete information concerning material facts or reasonable assumptions to be made, they undermine the reliability of their experts and their opinions. In any case, we are not bound by the opinion of any expert witness. We may accept an expert's opinion or we may reject testimony that is contrary to our own judgment, especially where the witness' *245 opinion of value is so exaggerated that the testimony is incredible. .
In this case, the opinions of petitioner's experts that O'Keeffe's works in the estate, individually valued in excess of $ 72 million, could have been sold on the date of her death for $ 18 million, defies common sense. Our conclusion is based in substantial part on the particular content of the works. The individual values of 44 pieces totaled almost one-half of the agreed value of the whole group! Respondent's expert's opinion is erroneous as a matter of law. There is no justification for his exclusion of the bequeathed art from the total subject to discount. Determination of fair market value assumes that works are in the market and precludes consideration that works are "unavailable for sale." He was not entitled to consider the actual disposition of the works of art of the estate any more than fair market value may be determined by assuming that particular purchasers will purchase works of art from the estate. See ; ; *246 . Thaw, Rose, and Adelson each testified at trial in support of their respective opinions of fair market value and in rebuttal of the adverse experts' testimony. In addition, petitioner called James H. Maroney, Jr. (Maroney), a dealer in 19th century and early 20th century American art, and Anthony M. Lamport (Lamport), a financial analyst and advisor to venture capital funds, in support of Thaw's opinion. Lamport prepared a pro forma income statement, making various assumptions about the financial return to a bulk purchaser investing in O'Keeffe's works on the date of death. The hypothetical purchaser assumed by Lamport would have sold O'Keeffe's works from a newly opened gallery in New York City. Lamport's analysis made no allowance for inflation in the prices of O'Keeffe's works but used rates of 10 percent to 32 percent to discount projected cash flow after expenses. According to petitioner, Lamport's analysis was intended only to explain expenses that a hypothetical buyer would consider in determining a fair purchase price. Although each of the experts was qualified to express an opinion *247 on the subject matter on which he or she was called to testify, each of them suffered from the same tendency to ignore relevant facts inconsistent with the position of the party employing the expert and to exaggerate facts consistent with the view espoused. Thus, each conclusion as to the appropriate blockage discount suffers from substantial defects and is patently unreliable. Thaw, for example, in effect assumed a forced sale in bulk of all of the works of the estate to a single buyer. Petitioner tries to justify that assumption by arguing that ascertainment of fair market value requires that property "must change hands" on the date of death. That argument is unsupported by authority or reason and ignores the concepts of willing buyers and willing sellers acting without compulsion -- the defining actors in a fair market value transaction. Petitioner also ignores the statement in its own trial memorandum that: the court has rejected expert analyses and proposed transactions that are unlikely or without foundation in the real marketplace or contrary to the interests of a hypothetical buyer. [; *248 Newhouse, 94 T.C. at 232-33 [. Expert testimony based on a flawed legal basis or presumption is irrelevant. .
The Court also rejects proposed transactions that are contrary to the interests of a hypothetical seller. Rose's opinion relied on her concern with the condition of certain of the works of art in the estate, although the individual condition of each work presumably would have been taken into account by Thaw in reaching the individual appraisals of the work. Thaw never indicated otherwise. Both Thaw and Rose conceded that they would not have recommended to a seller that the works in the estate be sold for the $ 18 million that they opined was the blocked value of the estate on the date of death. The discounts that Adelson applied to what he categorized as "Remaining Art" were inadequate. They were not consistent with IRS material recognizing blockage discount and explaining it as follows: The concept of blockage is essentially one of timing. A discount may be allowed where a large quantity of any one type of art is offered *249 on the market at one time and would substantially depress its value. The amount of the discount would be determined, in part, on a reasonable estimate of the time it would take to sell the entire quantity in smaller lots. Some of the factors to be considered in determining whether a blockage discount is available are the opportunity cost of holding the inventory, the carrying costs of the inventory, and the expected period of time it will take to dispose of the inventory. * * * The extent of the collection may also be a significant factor. [The IRS Valuation Guide for Income, Estate and Gift Taxes, CCH Fed. Est. & Gift Rep. No. 115 (Oct. 14, 1985) at 30 (the Guide).]
On cross-examination, Adelson stated that he was aware of the factors mentioned in the quoted material. Adelson's opinion as to the minimal discount, however, was inconsistent with his testimony as to the time required to sell works in the estate and apparently did not consider any "opportunity" or carrying costs. In support of the approach used by respondent's expert, respondent argues that: Unlike shares of stock which are fungible, individual works of art are both distinctive and unique in both medium, *250 size, composition, quality and saleability. The application of an across-the-board discount to works of art, which by its very nature ignores the uniqueness of works of art, would not be appropriate. Acknowledging that works of art, unlike stocks, are not fungible, and incorporating factors enunciated by the Court in Estate of Smith and Calder, respondent has developed a tiered approach to assess the appropriateness of blockage discounts in determining the fair market value of works of art.
Respondent's tiered approach was based solely on individual dollar values, i.e., no discount was applied to works valued at or more than $ 500,000, and 20-percent and 50-percent discounts were applied to categories of $ 200,000 to $ 499,999 and under $ 200,000, respectively. Respondent's approach of considering the specific segments of the estate and the uniqueness of pieces within the estate makes sense and is supported by the evidence, although the specific percentages used by Adelson do not and are not. At the Court's urging, respondent included a revised three-tiered proposed discount in her brief, but the percentages suggested would still be applied solely on the basis of *251 individual values. We are persuaded from Thaw's testimony and other evidence that the most valuable works would not necessarily be sold first and that some works of all types and values would be fed into the marketplace at a controlled pace. The most reliable consensus of the experts is that the better works could be sold within 7 years, and sale of the bulk of the estate would take more than 10 years. The record does not support any specific percentages at the levels proposed by respondent. While the parties each purportedly rely on , affd. , each takes parts of the opinion in that case out of context. In that case, the Court was required to determine the fair market value of 425 pieces of nonrepresentational metal sculptures created by David Smith. Respondent claimed that no discount should be applied to the total and that the fair market value of each item should simply be determined by the price at which the item could be sold separately in the retail art market on a "one-at-a-time" basis. The estate applied a 75-percent discount to the total. The Court stated: *252 We find it unnecessary, in this unusual case, to make any hard-and-fast choice between the two approaches urged by the parties. On the one hand, we think that the initial 75-percent discount, which petitioner has applied to the "one-at-a-time" value in order to determine the price which a purchaser would pay for all the sculptures, is too high. On the other hand, we think that respondent should have given considerable weight to the fact that each item of sculpture would not be offered in isolation. We think that, at the very least, each willing buyer in the retail art market would take into account, in determining the price he would be willing to pay for any given item, the fact that 424 other items were being offered for sale at the same time. The impact of such simultaneous availability of an extremely large number of items of the same general category is a significant circumstance which should be taken into account. In this connection, the so-called blockage rule utilized in connection with the sale of a large number of securities furnishes a useful analogy. See (C.A. 10, 1951), affirming a Memorandum Opinion *253 of this Court; (C.A. 8, 1942), affirming a Memorandum Opinion of this Court; (C.A. 4, 1938), affirming ; . We think that a museum or individual collector of art objects would not completely ignore the resale value of a given item, although it obviously has far less significance than in the case of a dealer. Moreover, the "retail market" claimed by respondent may well encompass the use of an auction method of disposal (to be distinguished from the usual forced-sale concept) for at least a part of the art objects; in such a situation the presence of a large number of pieces on the market at one time would be a most material factor. Under the foregoing circumstances, we think that, in this case, the amount which an en bloc purchaser for resale would pay and the aggregate of the separate "one-at-a-time" values to be obtained by a variety of dispositions in the "retail market" would be the same. [; *254 fn. refs. omitted.]
The Court took into account other elements involved in the valuation process as they existed at the time of death and rejected the estate's claim that future commissions on sales of the work should be considered. The Court concluded that the fair market value of the 425 sculptures at the moment of Smith's death was $ 2,700,000. Because the total of the individual values of the sculptures was $ 4,284,000, the parties in this case translate the Court's conclusion to a 37-percent discount. Nothing in the opinion, however, explains the conclusion of value by application of a particular percentage to the total. In , the Smith analogy to large groups of securities was extended, and a blockage discount was applied in valuing gifts of art. The Court noted that each of the parties in Calder had considered the length of time necessary to liquidate the artwork as a primary factor in coming up with the blockage discount. The Court then recalculated the blockage discount with reference to the average annual sales figure for the art in question, reducing the stream of income to its present value. *255 Although the record here contains some information about subsequent sales of the works in the estate, only a small percentage of the value has actually been liquidated in that manner. Neither party has urged application of the Calder approach here. Respondent argues in this case that petitioner's approach improperly takes into account future expenses to be incurred in selling O'Keeffe's works in the estate. According to respondent, this approach violates section 2053, which delineates and limits expenses deductible by an estate. Petitioner disputes this contention, asserting that the expenses to be taken into account by a hypothetical buyer are not affected by section 2053. Petitioner further argues that, even if expenses were ignored, projecting sales of O'Keeffe's works at $ 5 million a year and reducing that amount to the present value would require a discount in excess of 60 percent. Petitioner would ignore any inflation in the prices of the works over the period of sales -- an assumption we are not persuaded to accept. Because we do not include assumptions about specific expenses or rates of return in our analysis, we do not resolve this dispute. We do, however, *256 consider that the works could not be sold simultaneously on the date of death and that carrying costs would be incurred. Petitioner's experts acknowledge that there is a vast difference in quality among the pieces in the estate, although Thaw disagreed with Adelson's assumption that it would be appropriate to dispose of the most valuable pieces first. Although they mentioned, and purportedly relied on, their experience with estates of other artists, Thaw and Rose provided insufficient information for us to make a judgment on the comparability of those situations. The attempted comparisons to the estate of David Smith showed lack of meaningful "comparability". Unlike the situation in , affd. , the evidence in this case shows that the amount that would be paid for individual purchases of O'Keeffe's works and the amount that would be paid by a hypothetical en bloc purchaser would not be the same. There is too much variation among the different O'Keeffe works by type, quality, period, price, and other factors affecting the probable market for each work. Overall, petitioner's *257 experts' testimony was limited to the perceptions of dealers and art critics and ignored less sophisticated elements of the art market. From the evidence, it is apparent to us that different works in the estate would be of interest to different segments of the art market. The parties have not reasonably quantified assumptions about the specific markets in which segments of the works in the estate would be salable. Petitioner has erroneously assumed that all of the art would initially be sold to a bulk purchaser, who would purchase for resale. Petitioner thus ignores the market of collectors who, while taking into account resale value, are not primarily interested in the rate of return on the investment. Petitioner strenuously objects to evidence that, in fact, a substantial number of the most valuable works in the estate have been or will be distributed to museums. We are not persuaded that the market for O'Keeffe's works did not include museums, and petitioner's assertions on this point are disingenuous. Petitioner's experts stated, without supporting data, that museums were not in the market for O'Keeffe's works. This testimony, however, does not consider whether museums *258 were not in the market for O'Keeffe's works only because they anticipated distributions of 42 major works from the estate to 8 major art museums. The evidence of actual distributions and subsequent sales to museums refutes petitioner's experts' opinions about the interest of museums in O'Keeffe and thus cannot be ignored. Petitioner and its experts also argue that the market for O'Keeffe's works depended on her personality and personal sales efforts, but the objective evidence of sales of her works after her death belies that contention. Those sales may be considered for that purpose. It is equally plausible and more consistent with the objective evidence to infer that the methods of sale and the postsale constraints that O'Keeffe imposed limited the market for her works, so that the market opened up after her death. We conclude that the respective experts in this case each failed to consider the relevant market for particular works of O'Keeffe or groups of works in the estate. See sec. 20.2031-1(a), Estate Tax Regs. The failure to consider the relevant market undermined the respective positions of the parties in an analogous situation in , *259 affd. . There the Court was charged with the task of valuing gemstones contributed to the Smithsonian Institution. The Court found that the low valuations made by respondent's experts in that case were unacceptable because they were based on the erroneous assumption that the gems had to be valued on a bulk sale basis. The taxpayers' experts had reached high valuations by erroneously focusing on the prices at which items of jewelry were sold to customers of jewelry stores. The Court stated: What we have in this case are two sets of valuations, each of which is based upon a substantially incorrect view of how the property at issue should be valued. In some cases in which experts' valuations are based on incorrect assumptions, it may be possible for the Court to construct reliable estimates of fair market value by adjusting for the discredited assumptions. However, this is not such a case. [.]
On that record, the Court decided the issue against each party to the extent that that party had the burden of proof. We cannot rely on the burden of proof in this case. There is evidence from which *260 we can determine a value, although we are frustrated and imposed upon by the lack of reliable expert opinion supporting the discounts claimed by the opposing parties. We are persuaded that O'Keeffe's works in the estate on the date of her death should be segmented, not necessarily by value but by quality, uniqueness, and salability. There should be at least two categories, i.e., works that are salable within a relatively short period of time at approximately their individual values and works that can only be marketed over a long period of years with substantial effort. We believe that petitioner's experts' opinion is valid only as applied to the second category of works. Respondent's argument is meritorious with regard to the first category. For want of a more reliable breakdown, we conclude that one-half of the value of O'Keeffe's works in the estate would be appropriately subjected to petitioner's experts' analysis and should be discounted 75 percent. Using our best judgment on the entire record, we conclude that the other half of the total value of O'Keeffe's works should be discounted 25 percent. After considering the entire record, we conclude that the fair market value *261 of O'Keeffe's works in the estate at the date of death was $ 36,400,000. To reflect the agreement of the parties and our conclusion, Decision will be entered under Rule 155.