# UNITED STATES COURT OF APPEALS

## FOR THE SECOND CIRCUIT

August Term, 2004

(Argued: August 5, 2005                    Decided: November 15, 2006)

Docket No. 04-4443-ag

_____

CARROLL JANIS, DONNA L. SELDIN JANIS,

*Petitioners-Appellants*,

v.

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

_____

Before: POOLER, SOTOMAYOR, Circuit Judges, and KORMAN, District Judge[*]

Appeal from the judgment of the United States Tax Court (Cohen J.) assessing income tax deficiencies for the taxable years 1995, 1996, and 1997.

Affirmed.


BRANDON WHITE, Foley Hoag, LLP, Boston, MA, *for Petitioners -Appellant*s (JOHN H. HENN, attorney, on the brief).

FRANCESCA U. TAMAMI, Attorney, Department of Justice, Tax Division, Washington, D.C.,*for Respondent-Appellee* (EILEEN O'CONNOR, Assistant Attorney General, JONATHAN S. COHEN, attorneys, on the brief).

---

[*] The Honorable Edward R. Korman, Chief Judge of the United States District Court for the Eastern District of New York, sitting by designation.

KORMAN, District Judge:

Sidney Janis owned and operated a well-known art gallery in New York City. In 1988, he transferred ownership of the gallery to a trust, naming himself and his sons, Conrad and Carroll, trustees. Sidney Janis died a year later, leaving Conrad and Carroll with ownership of the gallery through the trust. This arrangement lasted until 1995, when the brothers terminated the trust and distributed its assets, including the gallery and its paintings, to a partnership. The brothers were the only members of the partnership, and they each held equal shares of its assets. These assets included 464 items of artwork that the gallery owned at Sidney's death. This appeal from a judgment of the United States Tax Court assessing income tax deficiencies for the taxable years 1995, 1996, and 1997 turns on the proper method for determining any gain or loss Conrad and Carroll sustained when they sold a number of these works in the years after they inherited the gallery. Specifically, the issue is whether the fair market value of the artwork upon which the estate tax was calculated also constitutes the cost basis of the property for income tax purposes when it was later sold. We hold that it does where, as here, the taxpayers do not challenge the accuracy of the method used to calculate the fair market value of the works of art upon which the estate tax was calculated.

The judgement of the Tax Court generated two appeals. The one taken here by Carroll Janis and his wife, and a second taken to the Court of Appeals for the Ninth Circuit by the other Janis brother, Conrad, and his wife. On August 21, 2006, the Ninth Circuit affirmed the judgment of the Tax Court. Specifically, the Ninth Circuit held that the value of the artwork owned by Sidney Janis at his death was a question of fact and that (1) the valuation of $14.5 million placed upon it by the Tax Court was not clearly erroneous and (2) the Janises were obligated by "the duty of consistency" to use the same $14.5 million figure, which they employed for the purpose of calculating the estate

2

tax, when they calculated the cost basis on their income tax returns. Janis v. Comm'r of Internal Revenue, 461 F.3d 1080 (9th Cir. 2006). While we likewise affirm the judgment of the Tax Court, we do so for different reasons, which are explained more fully in the discussion following the complicated background of this appeal.

BACKGROUND

The resolution of this appeal begins with the estate tax return ("Form 706") filed by Carroll and Conrad Janis as co-executors of Sidney Janis's estate. The estate tax is imposed on the fair market value of the assets of the estate as of the date of death or a date six months from the date of death at the option of the estate. 26 U.S.C. § 2031(a); 26 C.F.R. § 20.2031-1(b); 26 C.F.R. § 20.2032-1. The latter date, which is referred to as the alternate valuation date, was the date chosen by the estate because the value of the artwork – the principal asset of the Sidney Janis Gallery – was "less than the valuation thereof at the date of death." The gallery's 464 items of artwork were appraised by Sotheby's at $25,876,630, as of the alternate valuation date. Sotheby's appraised the underlying artwork for the Janises "at their retail values on an individual-by-individual art work basis." This valuation, however, was not the fair market value of the artwork "if [these items] were to be placed for sale in the ordinary course in the market at one time." Nor did it reflect the sum that a prospective purchaser of the gallery would pay. Rather, the appraisal offered by Sotheby's was merely hypothetical and was of little value unless adjustments were made to take into account other factors. Indeed, the Janises stated in their Form 706 that "[t]here can be no question that the retail market for individual art works would not be an appropriate market in which to sell decedent's interest in the Gallery itself." Instead, they took the position that

the most reasonable approach to valuation is to take the underlying

3

> asset value, adjusted to reflect the actual realizable value in the context of an operating business. . . . [W]here there are valuable underlying assets in a business, as here, a willing buyer would try to value the business by reference to the amount he might receive from a disposition of such underlying assets in the ordinary course.

A willing buyer would not pay the aggregate retail value of each piece, because that would rule out any profit in the sale of the artwork and because it would take time and the concomitant expense of operating the business over time to obtain the retail value of each piece. A significant discount off the aggregate retail value would be required to take account of these factors. Based principally on the foregoing consideration, as well as other adjustments in the appraised valuation that we pass over, including one recommended by Sotheby's, the Janises took the position in the estate tax return that the fair market value of the artwork was $12,403,207 – a 52% discount off the Sotheby's appraisal.

The IRS elected to audit the return. As part of the audit, the IRS Art Advisory Panel (the "Panel") reviewed 427 of the 464 pieces of art, which represented 95% of the total value of the collection, and accepted the stated value of the remainder. The Panel was created by the IRS "to assist it in reviewing selected cases involving taxpayer valuation of major art objects. . . . [It] is composed of nationally prominent art museum directors, curators, and art dealers appointed by the Commissioner. . . . " John G. Steinkamp, Fair Market Value, Blockage, and the Valuation of Art, 71 Denv. U. L. Rev. 335, 407-08 (1994) (internal footnotes omitted). Like Sotheby's, the Panel appraised the retail value of each work on an individual basis. By this method, it determined that the aggregate retail value of the collection was $36,636,630. The Panel concluded, however, that this did not represent the fair market value of the artwork, because it did not reflect the reality that the gallery's collection would command a much lower price if sold at approximately the same time.

4

To reflect this, the Panel recommended a 37% discount, for a total discounted value of $22,955,077.

The Panel invoked the necessity of applying a blockage discount to justify the reduced value. "The theory behind a blockage discount," as the Janises observe, "is that if a large quantity of any item is added to the existing supply, the price of all such items will tend to fall." As one commentator has observed:

> Blockage is triggered by a determination that an item's value in the marketplace does not accurately reflect its fair market value because it is part of a block which cannot be sold within a reasonable time without adversely affecting price. If value is determined by reference to market prices on the basis that the taxpayer in fact could have sold the property at the market price, support for such an approach disappears when the quantity available for sale greatly exceeds the market's usual volume. Judicial consideration of blockage resulted from recognition that per unit market prices did not always accurately reflect the fair market value of units held as part of a large block.

Steinkamp, Fair Market Value, supra, at 385 (internal footnote omitted); see also Estate of O'Keeffe v. Comm'r, 63 T.C.M. (CCH) 2699 (1992) (noting that the application of a blockage discount to value an estate's paintings was appropriate, because "if . . . all or a substantial portion of those works had been simultaneously offered for sale on the date of death, the availability of such a large block of O'Keeffe's works would have depressed the price to be paid for each of the individual works"). While "[t]he Estate of Sidney Janis is not an artist's estate, and does not involve a large number of works by one particular artist, but rather works by many different artists," the Panel concluded that "some of the general principles" underlying the blockage discount applied in a somewhat modified way.

The gap between the fair market value asserted by the Janises and the Panel was bridged in subsequent negotiations that resulted in an agreed upon valuation of $14,500,000 for the artwork.

5

This sum was approximately 12% more than the aggregate fair market value the Janis brothers had claimed on the estate's tax return. Because it was the result of a compromise, it is not entirely clear how the parties came to that number. For our purposes, it is enough that the IRS and the Janis brothers agreed that it would not have been possible to sell the 464 pieces of artwork for the retail value that each piece could bring if sold separately over time. The discount the parties used was applied to the aggregate value and the parties did not attempt to determine whether the discount should be applied in the same way for each item of artwork.

On February 19, 1994, just three weeks after settling with the IRS, Carroll and Conrad amended their Form 1041 income tax returns for 1990 through 1992. A time bar prevented them from amending their returns for 1989. During those years, the Janises continued to operate the gallery through the trust and sold various items of artwork that were owned by the gallery when their father died. Their original income tax returns for those years determined the fair market value of each item sold by applying a 52% discount to the Sotheby's valuation of $25.9 million. This reflected the aggregate fair market value of $12,403,207 claimed in the estate tax return.

Because of the audit of the estate tax return, amended income tax returns were necessary to reflect an increase in the value of the artwork to $14,500,000. This increase, as we explain below, would operate to moderately reduce the profit, if any, on the sale of the artwork and any consequent income tax. The Janis brothers, however, did not seek a moderate adjustment. While they claimed that the amended return was the "result" of the IRS audit, they asserted that the fair market value of the artwork was $36,636,630 – the aggregate *undiscounted* retail appraised valuation of the Panel. They elected to use this valuation in their amended income tax returns and in the returns at issue here that they filed in the three years after the estate tax audit, even though everyone had agreed that this

appraisal, like the undiscounted appraisal by Sotheby's, did not reflect the fair market value of the property at the date of Sidney Janis's death or on the alternate valuation date six months later. Moreover, the Janises did not explain the choice of the undiscounted appraisal of the Panel instead of the lower one that they had obtained from Sotheby's.

The reason for this is obvious. The embrace of the Panel's undiscounted valuations created a much more substantial income tax savings than the discounted appraisal of Sotheby's or of the Panel, because the gallery used inventory accounting. Under this system, a business calculates gross income by subtracting the cost of goods sold from its gross receipts. Thus, the greater the cost of goods sold, the lower the gross income will be. For example, if the gallery's collection consisted of one item valued at $4 million at the time of Sidney Janis's death, and that item was sold a year later for $5 million, then gross income would equal $5 million and the cost of goods sold would be $4 million, leaving the gallery with a gross profit of $1 million. On the other hand, if the cost of the item of artwork is discounted, then the gallery's gross income will increase. Thus, if a 50% discount is applied, it reduces the cost of goods sold to $2 million, leaving the gallery with a gross income of $3 million and a correspondingly greater tax liability. More significantly for present purposes, if the hypothetical item of artwork valued at $4 million is sold for $2 million, the taxpayers suffer a paper loss of $2 million, which operates to reduce their taxable income.

By adopting the $36,636,630 valuation, the Janis brothers increased the cost of goods sold such that the gallery sustained net operating losses for each year from 1990 through 1995. Significantly, these losses flowed through to the brothers' individual federal income tax returns. This allowed Carroll and Conrad (filing jointly with their wives Donna Seldin Janis and Maria Janis, respectively) to claim carryover losses from the trust on their 1995, 1996, and 1997 tax returns.

7

These losses, combined with the partnership's losses in 1996 and 1997, effectively eliminated all of Carroll's income tax liability. In 1995 and 1996, Carroll, whose claim is now before us, reported zero taxable income, and in 1997 he reported only $15,312 in taxable income.

The IRS audited the 1995, 1996, and 1997 income tax returns. It determined that the cost basis of the artwork they sold should have been based on the $14,500,000 value that was agreed upon for estate tax purposes. This value would have resulted in smaller losses for the gallery in 1995 and taxable profits in 1996 and 1997. Since the gallery's losses passed through to Carroll and Conrad, the IRS issued deficiency notices for each of their personal income tax returns in 1995, 1996 and 1997. The IRS determined deficiencies of $532,930 for 1995, $58,635 for 1996, and $169,248 for 1997, for Carroll and his wife Donna Seldin Janis and comparable deficiencies for his brother Conrad and his wife in an amount not relevant here. The Janises appealed the assessment to the Tax Court, which affirmed the assessed deficiencies. Janis v. Comm'r, 87 T.C.M. (CCH) 1322 (2004). Carroll and his wife now appeal from that judgment.

On this appeal, the Janises argue that the fair market value of the art sold should be the value attributed to it by the Panel, without the discount that both the Panel and the Janises agreed was necessary to reflect the fair market value of the collection. Because these discounts were necessary to determine the value of the artwork at the time of Sidney's death, the IRS argues that, if the Art Advisory Panel's aggregate retail value of $36,630,360 – as opposed to the much lower Sotheby's appraisal – is to be used, then a 60.42% discount, from which the $14,500,000 aggregate value was derived, should be applied to determine the cost basis of each of the 464 items of artwork the Janises inherited. Obviously, if the Janises had relied on the Sotheby's appraisal, the IRS would have argued for a 44% discount, because such a discount was necessary to bring the appraisal down to the

8

$14,500,000 agreed upon fair market value. The IRS's insistence on a discounted valuation, whether based on the Sotheby's appraisal or that of the Panel, would have the effect of reducing the gallery's losses and increasing the Janises' income tax liability. We agree with the IRS that, whichever appraisal was used, an appropriate discount is required to determine the fair market value of the property.

## DISCUSSION

We begin by emphasizing two simple propositions. First, the fair market value of property on the date of death is the price that property would have brought if it had been offered by a willing seller to a willing buyer on that date, United Stated v. Cartwright, 411 U.S. 546, 551 (1973); Elmhurst Cemetery Co. v. Comm'r, 300 U.S. 37, 39 (1937). This definition of fair market value sets the standard for determining the value of the property for the purpose of calculating the estate tax. 26 U.S.C. § 2031(a); 26 C.F.R. § 20.2031-1(b). Second, when the inherited property is sold, the income tax due on the sale, if any, is assessed on the difference between the sale price and "the fair market value of the property at the date of the decedent's death." 26 U.S.C. § 1014(a); see also 26 C.F.R. §1.1014-3. We have held that an appraisal for estate tax purposes is "prima facie the fair market value" of the property when the income tax is calculated for a subsequent sale. Plaut v. Munford, 188 F.2d 543, 545 (2d Cir. 1951) (Hand, J.). Consistent with that holding, the IRS has taken the position that the appraisal for estate tax purposes "is not conclusive but is a presumptive value which may be rebutted by clear and convincing evidence." Rev. Rul. 54-97, 1954-1 C.B. 113. Because this ruling is consistent with our interpretation of 26 U.S.C. § 1014(a) and 26 C.F.R. § 1.1014-3, the corresponding IRS regulation, we do not pause to determine the deference it would otherwise be due. See generally Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944). Suffice it to

9

say that the statutory and regulatory scheme compel the conclusion that, if the fair market value was properly determined for the purpose of calculating the estate tax, then it must provide the cost basis for calculating profit or loss when it is later sold. See United States v. Parker, 376 F.2d 402, 408 (5th Cir. 1967) (holding that "for most purposes" there is no distinction between the meaning of fair market value in the estate and income tax contexts). Indeed, the Janises implicitly acknowledged the validity of this position in the initial tax returns they filed when they calculated the cost basis of the artwork they sold based on the discounted value used to calculate the estate tax.

Unlike the taxpayers in Augustus v. Comm'r, 40 B.T.A. 1201 (1939), aff'd, 118 F.2d 38 (6th Cir. 1941), the case upon which they rely, the Janises do not challenge the accuracy of the blockage discount that led to the agreed upon fair market value of the artwork for the purpose of calculating the estate tax. Nevertheless, they assert that "[t]he policies motivating the application of the blockage discount in the estate context" to determine the fair market value of estate-owned artwork do not justify using the same fair market value when that artwork is sold. According to the Janises, "the policy supporting the step-up basis of property transferred upon death militate[s] against application of the discount."

We are at a loss to understand this argument. "The policies motivating the application of the blockage discount in the estate tax context" reflect the goal of achieving a fair and rational evaluation of the market value of the property on the date of death. Again, if the application of the blockage discount resulted in an accurate valuation of the property, then the underlying policies have been served, and the valuation must apply in fixing the cost basis for income tax purposes when the property is later sold. Nor is "the policy supporting the step-up in basis of property transferred upon death" undermined in anyway by such a consistent result. The "step-up" to which the Janises refer

10

is a shorthand for the rule that, even if the decedent acquired property at a fraction of its fair market value at his death, it is the value at death that determines the cost basis to his heirs when the income tax due on its subsequent sale is calculated.

This rule avoids a double tax on the appreciation in the value of the property that occurred prior to death. The estate tax, which is based on the fair market value at the time of death, taxes this unrealized capital gain. If the cost basis to the heirs was the acquisition cost to the decedent, the unappreciated capital gain would be taxed a second time. In order to avoid this result, the cost basis of the property when it is later sold is the fair market value at the time of death, i.e., a step-up from the cost of the artwork to the decedent. The only gain that is taxed on its subsequent resale is that incurred as a result of an increase in value after the date of death. The statutory scheme "express[es] Congress's intent that unrealized gain taxed to the decedent's estate at his death shall not be subjected to another tax when it is subsequently realized by the estate or a legatee." Levin v. United States, 373 F.2d 434, 438 (1st Cir. 1967).

The Janises benefited from this statutory scheme. They acknowledge that much of the gallery's inventory at the time of Sidney Janis's death was acquired by him, over time, at a fraction of its fair market value at the time of his death. Nevertheless, the latter value, rather than the acquisition cost of the artwork, provided the cost basis for calculating the profit or loss to the Janises when they later disposed of it. Of course, the fair market value of the artwork that was determined by use of the blockage discount reduced the value of the Janis estate and saved the Janis brothers millions of dollars in taxes that would have significantly reduced their inheritance. This benefit, though, has the effect of increasing the income taxes on the property when it is sold. This has nothing to do with undermining "the policy supporting the step-up of property transferred at death."

11

Instead, it has the salutary effect of discouraging unreasonably low valuations of estate-owned property:

> The success of an estate in getting through IRS audit a low valuation of property may turn into a Pyrrhic victory in the event of subsequent income taxation. This is a matter practitioners in the field are well aware of and it tends to minimize disputes as to the valuation of estates, where assets other than listed securities are involved, and especially with real property. It furthers the concept of self-assessment.

Hess v. United States, 537 F.2d 457, 463 (Ct. Cl. 1976).

The Janises succeeded in "getting through the IRS audit a low valuation of their property," perhaps an unreasonably low one, and thus have deprived themselves of the full step-up basis to which they may have otherwise been entitled. The result they now seek would have the effect of encouraging efforts by estates to secure unreasonably low valuations of artwork and perhaps discourage the IRS from continuing the accommodating policy it followed here. See Steinkamp, Fair Market Value, supra, at 398 ("Although the taxpayer has the burden of proof, commentators have suggested that the Commissioner rarely challenges art valuations."); William M. Speiller, The Favored Tax Treatment of Purchasers of Art, 80 Colum. L. Rev. 214, 238 (1980) (suggesting that, while the IRS is in "constant disagreement" with taxpayers in art valuation cases, litigation rarely results). More significantly, the position of the Janises undermines a statutory scheme designed to tax the unrealized gain in the value of property by way of the estate tax and to tax any profit above that gain by the income tax. Indeed, the Janises not only seek to avoid any tax on the gain in the value of the artwork since they inherited it, they seek to reduce other income taxes by using the undiscounted value of the artwork that concededly did not reflect its fair market value. The Internal Revenue Code does not permit them to do this.

We conclude by acknowledging that this would be a closer case if the Janises had argued that the across-the-board application of the 60.42% discount to each item, without an individual determination of whether the discount is appropriate, was arbitrary and unfair. We need not decide whether such an argument could have succeeded here, because it is not made and because the Janises never offered any evidence to support it. Instead, the Janises claim that the cost basis for each item of artwork to them is the undiscounted value of the item as if it had been sold separately and that it is unfair to take into account the fact that this sum could not have been realized on the date of death or on the alternate valuation date. This argument ignores the fact that the discounted value was simply a method of determining the aggregate fair market value of the collection and that it was predicated on the assumption that the gallery's inventory would be disposed of at once rather than in the ordinary course of business. Again, the Janises acknowledged this when they represented to the IRS that the aggregate fair market value was $12,403,207 in their estate tax return and when they used the discounted value as the cost basis for the artwork in the income tax returns they filed prior to the conclusion of the estate tax return audit. Indeed, they do not offer any explanation for altering the method used to calculate the cost basis in these income tax returns. Under these circumstances, we see no reason why the ultimate fair market value to which they agreed, $14,500,000, should not be used to determine the cost basis of the property they sold after Sidney Janis's death. Since this sum is 62% of the Art Advisory Panel's valuation, each item should be discounted by this amount.

Because the effort of the Janises at tax avoidance was properly rejected by the Tax Court, the judgment appealed from is affirmed.