T.C. Memo. 2015-96

UNITED STATES TAX COURT

VICTOR FARGO AND VIRGINIA KING, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

GIRARD DEVELOPMENT, L.P., GIRARD MANAGEMENT CORPORATION,
TAX MATTERS PARTNER, Petitioner v. COMMISSIONER OF INTERNAL
REVENUE, Respondent

Docket Nos. 28970-11, 166-13.          Filed May 26, 2015.

W. Alan Lautanen, for petitioners.

Kathleen A. Tagni and Jeffrey L. Heinkel, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, Judge:  In the consolidated case at docket No. 28970-11,

respondent determined a deficiency and a penalty under section 6662(a) with

[*2] respect to the joint income tax of petitioners Victor Fargo and Virginia King

(Fargo and King) as follows:[1]

|  Year | Deficiency | Penalty sec. 6662(a) |
|-------|------------|----------------------|
| 2002 | $322,064 | $64,052 |

In the consolidated case at docket No. 166-13, regarding Girard Development,

L.P. (GDLP), an entity subject to partnership procedures under section 6226,[2]

respondent's notice of final partnership administrative adjustment (FPAA)

determined that the partnership had realized an ordinary income gain from the sale

of property in 2002 of $7,474,645 rather than the reported capital gain of

$628,222.

After concessions by respondent,[3] the issues remaining for decision are:

(1) whether the sale of the property in question generated capital gain or

ordinary income for Fargo and King. We hold that the sale generated ordinary

income;

---

[1]All dollar amounts are rounded to the nearest dollar.

[2]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[3]Respondent has conceded that the $360,000 developer fee paid by GDLP is included in GDLP's basis in the property at issue.

**[*3]** (2) whether GDLP's reported basis in the property at issue must be reduced. We hold that the basis must be reduced in part;

(3) whether payments totaling $1,306,000 made by Ms. King's wholly owned S corporation, Girard Management Corp. (GMC), are ordinary and necessary expenses. We hold that they are not;

(4) whether GMC's payments are distributions to Ms. King. We hold that they are not;

(5) whether Fargo and King are entitled to the full amount of a net operating loss carryforward. We hold that they are not;

(6) whether Fargo and King are entitled to deduct additional home mortgage interest. We hold that they are not;

(7) whether Fargo and King are entitled to a deduction for investment interest. We hold that they are not; and

(8) whether Fargo and King are liable for an accuracy-related penalty under section 6662. We hold that they are.

[*4]                              FINDINGS OF FACT

A.  Background

Some of the facts have been stipulated and are so found.  When Fargo and King filed their petition, their residence was in California.  GDLP's principal place of business was also in California when its petition was filed.

Fargo and King were engaged in the real estate business during all relevant periods.  Ms. King is a licensed real estate broker in California.  The couple conducted their business through a number of entities, including GMC; Fargo Industries Corp. (FIC), a C corporation wholly owned by Mr. Fargo; King Real Estate, Inc. (KRE), a C corporation wholly owned by Ms. King; Girard Property Corp. (GPC), a C corporation wholly owned by Ms. King; and GDLP, a TEFRA partnership of which Mr. Fargo and Ms. King are directly or indirectly the majority partners and GMC is the tax matters partner.  Numerous commercial real estate developments were conducted through their related entities.

B.  Acquisition, Development, and Sale of the La Jolla Property

The background of the real estate transaction in issue begins in December 1988.  FIC acquired a leasehold from La Jolla Medical Building Corp., an unrelated entity, to lease a 2.2-acre parcel of real estate (La Jolla property) including a building and site development plans.  The La Jolla property's address

[*5] was 7255 Girard Avenue, La Jolla, California. The owner of the La Jolla property was La Jolla Country Club. FIC acquired the leasehold in the La Jolla property with the plans to develop a 72-unit apartment complex and retail space. The leasehold was purchased for $2,700,000, paid in installments ending in 1990. The lease agreement between FIC and the La Jolla Country Club initially ran through 2008 but was subsequently extended to run through 2042 for additional consideration of $900,000. The lease was extended to allow Fargo and King more time to develop the La Jolla property.

When FIC acquired the leasehold in the La Jolla property, it also acquired the improvements that had been developed by La Jolla Medical Building Corp., including a tenant-occupied medical building and certain plans, drawings, reports, surveys, and permits.

The lease agreement between the La Jolla Country Club and La Jolla Medical Building Corp. was due to expire on August 31, 2008. In order to extend the term of the lease past August 31, 2008, La Jolla Medical Building Corp. had to meet certain conditions precedent, including redeveloping the La Jolla property according to the terms of the lease agreement. FIC acquired La Jolla Medical Building Corp.'s lease with the same constraints.

[*6]   In 1991 FIC transferred the leasehold in the La Jolla property to GDLP for a capital contribution credit less than FIC's basis in the property.  At the time of its formation and the contribution of the leasehold, GDLP entered into various agreements with related parties for the development and management of the La Jolla property.  Those agreements provided for the payment of various fees for such services.  After GDLP acquired the leasehold, several hurdles to the development of the La Jolla property arose.  In the early 1990s the real estate market in La Jolla declined dramatically.  As a result, development of the La Jolla property was suspended.  Nonetheless, Mr. Fargo sought financing to develop it.  In another attempt to obtain financing, GDLP purchased the La Jolla property from the La Jolla Country Club in 1997 in fee simple for $1,750,000.

In 1993 Norby, Inc. (Norby), an unrelated entity with which Mr. Fargo and FIC had previously worked, filed a lawsuit against Mr. Fargo and FIC because Mr. Fargo and FIC had defaulted on a $10 million loan for an unrelated development project.  The parties negotiated to partially resolve the Norby litigation with a partnership interest in GDLP, and Norby acquired a partnership interest in GDLP in October 1991.  The negotiations resulted in an amended partnership agreement, an amended marketing and brokerage agreement, and a property management agreement.

[*7]   Through 2001 the La Jolla property was developed for residential use.  The extent of physical improvements was limited to minor repairs.  These minor repair costs were capitalized and amortized over the course of the holding period.  At the end of 2001 the balance of the leasehold improvements was reported to be $73,406.55.  Although Fargo and King did not make substantial alterations to the La Jolla property, GDLP capitalized substantial amounts for construction in progress.  From 1991 through 2001 GDLP capitalized $1,828,982 of construction in progress.  In the years 1999, 2000, and 2001 GDLP incurred costs for construction of $233,000, $216,337, and $999,585, respectively.  These costs primarily comprised architecture, engineering, appraisal, permits, and licensing fees.

Before GDLP purchased the leasehold, La Jolla Medical Corp. used the building as rental space for medical offices.  After the 1989 acquisition of the leasehold, rental income was generated from tenants occupying the medical offices.  From 1989 until the time the property was sold, the rental income was the only income generated from the La Jolla property.  In addition to collecting rent, Mr. Fargo's rental companies used the building for their business operations.  FIC, GDLP, and other entities owned by Fargo and King used the building as office space for accounting, bookkeeping, and other business purposes.

**[*8]**  After 1989 the La Jolla property was maintained as a business location and rental property.  In 1993 GDLP entered into an agreement with KRE, a real estate management company owned by Ms. King.  The agreement provided that KRE would manage, operate, maintain, and lease the La Jolla property.  GDLP paid KRE $3,000 a month for its services.

No substantial efforts were made to solicit potential buyers for the La Jolla property before 2001.  GDLP never listed the La Jolla property for sale and never marketed it to real estate developers.  The only effort to sell the La Jolla property was made in 1993, when GDLP entered into a marketing and brokerage agreement with GPC, a real estate brokerage company owned by Ms. King.  Nonetheless, GPC never undertook substantial efforts to sell the property.

In 2001 Centex Homes, an unrelated entity, made an unsolicited offer to purchase the La Jolla property for $16 million.  The purchase price was subsequently renegotiated for $14,500,000 plus a share of the home sales profits.  Centex Homes purchased the property from GDLP in 2002 to develop residential townhouses largely on the basis of previous plans that Mr. Fargo's entities developed.  The sale contract between GDLP and Centex Homes obligated GDLP to continue its best efforts with the development process already in place.  After Centex Homes purchased the property, GDLP incurred subsequent development

[*9] costs that were reimbursed by Centex Homes. In 2004 GDLP sued Centex Homes. As a result of the litigation, Centex Homes paid GDLP an additional $1,500,000 in full satisfaction of any amounts that may have been due under the sale contract.

C. GDLP's Basis for Computing the Gain on Sale

In 2002 GDLP calculated its basis in the La Jolla property, accounting for pre-2001 capitalized development costs of $613,060, a payment of $108,531 to GPC for interest on a loan, a payment of $360,000 to GPC for a development fee, a payment of $303,057 to GPC for interest on the development fee, and an unreconciled difference of $518,000.

D. Fargo and King's Form 1040

On September 16, 2002, GMC paid GPC an "incentive development fee" of $456,000 on GDLP's behalf based on the sale price of the property and paid KRE an "additional sales commission" of $350,000. On December 17, 2002, GMC wire transferred $500,000 to FIC also on GDLP's behalf. GDLP had sufficient funds to pay the fees at the time of the payments. GMC deducted the $1,306,000 on its Form 1120S, U.S. Income Tax Return for an S Corporation, for 2002, which flowed through to Mr. Fargo and Ms. King's joint Form 1040, U.S. Individual Income Tax Return, for 2002. These were the only payments made by GMC on

[*10] behalf of GDLP.  The only agreement that existed between GMC and GDLP was the partnership agreement, and it did not generally obligate GMC to pay GDLP's expenses.

On January 14, 2002, Norby filed another lawsuit against Fargo and King as well as GDLP, GMC, FIC, KRE, and GPC.  Norby also obtained a temporary restraining order prohibiting the escrow company from distributing the sale proceeds from the La Jolla property to GDLP until the dispute was resolved.  Norby entered into a comprehensive settlement agreement with the Fargo parties which contained numerous provisions regarding the payments and distributions between and among all of the affected parties and entities.  In relevant part, the settlement agreement stipulated that GDLP could pay the incentive development fee of $456,000 to GPC, but only to the extent of the Centex Homes profit participation and without interest.  The settlement agreement also stipulated that GDLP could retain $500,000 to pay GMC for management compensation.

Fargo and King's home was refinanced multiple times.  In 2002 Fargo and King refinanced a loan of $1,470,000 with a loan from the same lender of $1,590,000, and the negative amortized interest was rolled into the new loan principal.  Mr. Fargo and Ms. King applied their alleged remaining net operating loss carryforward balance of $1,107,105 on their Form 1040 for 2002.

**[*11]**                                          OPINION

I. <u>Burden of Proof</u>

Generally, the taxpayer bears the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner in a notice of deficiency are incorrect. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. Rule 142(a)(1); <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 84 (1992). The burden of proof on factual issues that affect a taxpayer's liability for tax may shift to the Commissioner if certain criteria are met. Sec. 7491(a)(1). Petitioners have not argued or otherwise demonstrated that section 7491 applies and therefore bear the burden of proof with respect to the income tax adjustments.

II. <u>Character of Income</u>

These cases present the question of whether gain from the sale of real property resulted in ordinary income or capital gain.[4] Respondent contends that the sale of the La Jolla property to Centex Homes produced ordinary income.

---

[4]This issue was for decision solely in the case at docket No. 166-13. However, since GDLP is a passthrough entity, we would presume that the calculation would flow through to Fargo and King in the Rule 155 computation.

**[\*12]** GDLP argues the sale produced capital gain because it held the land for investment.

Section 1221(a)(1) defines a capital asset as "property held by the taxpayer * * * but does not include * * * property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business".  Section 1221(a)(2) provides that a "capital asset" does not include "real property used in * * * [the taxpayer's] trade or business".

The Supreme Court has held that it is appropriate to construe the definition of capital asset narrowly while simultaneously construing the Code's definition of exclusions from capital asset status broadly.  Commissioner v. Gillette Motor Transport, Inc., 364 U.S. 130, 134-135 (1960).

Whether a taxpayer held specified property primarily for sale to customers in the ordinary course of business is a question of fact.  Rockwell v. Commissioner, 512 F.2d 882, 884 (9th Cir. 1975), aff'g T.C. Memo. 1972-133. The term "primarily" for purposes of section 1221(a)(1) means "of first importance" or "principally".  See Malat v. Riddell, 383 U.S. 569, 572 (1966). This Court has identified several factors for evaluating whether a taxpayer held certain properties primarily for sale to customers in the ordinary course of business, including:  (1) the purpose for which the property was initially acquired;

[*13] (2) the purpose for which the property was subsequently held; (3) the extent to which improvements, if any, were made to the property by the taxpayer; (4) the frequency, number, and continuity of sales; (5) the extent and nature of the transactions involved; (6) the ordinary business of the taxpayer; (7) the extent of advertising, promotion, or other active efforts used in soliciting buyers for the sale of the property; (8) the listing of property with brokers; and (9) the purpose for which the property was held at the time of sale. Maddux Constr. Co. v. Commissioner, 54 T.C. 1278, 1284 (1970). We must decide each case upon its particular facts, and the presence of any one or more of these factors may or may not be determinative of a particular case. Redwood Empire Sav. & Loan Ass'n v. Commissioner, 628 F.2d 516, 517 (9th Cir. 1980), aff'g 68 T.C. 960 (1977).

Upon review of the relevant factors, we conclude that GDLP has not sufficiently established the facts necessary to its case, nor has it carried its burden of proving respondent's determinations were in error.

### 1. The Purpose for Which the Property Was Initially Acquired

GDLP and respondent agree that the initial investment in the La Jolla property was for development purposes. This is evidenced by FIC's original intent when it acquired the leasehold in 1989 to develop the La Jolla property for resale to customers. GDLP's 1997 purchase of the La Jolla property in fee simple

**[\*14]** to improve chances of obtaining development financing further evidences its intent.

However, although a taxpayer's initial motivation in acquiring property is relevant, the ultimate question is the taxpayer's purpose at the time of sale. Maddux Constr. Co. v. Commissioner, 54 T.C. at 1286. It is clear that GDLP initially acquired the La Jolla property in the normal course of business, but the crucial factor is the purpose for which the La Jolla property was held at the time of sale.

### 2. The Purpose for Which the Property Was Subsequently Held

GDLP contends that it held the La Jolla property primarily to allow the La Jolla real estate market to recover from the recession; thus, it should be viewed as an investment. It is well established that a taxpayer in the real estate business may hold real estate as an investment. Rouse v. Commissioner, 39 T.C. 70 (1962).

Although we believe that GDLP held the La Jolla property, in part, to allow the market to recover, we think that was not GDLP's primary purpose. GDLP never abandoned its development plan, as evidenced by its multiple attempts to obtain financing and by the expenses it incurred for architectural, engineering, and appraisal fees. GDLP incurred substantial fees relating to development expenses, with an accumulated balance of $1,828,982 at the end of 2001. The development

[*15] expenses were incurred each year between 1991 and 2001, indicating that the developmental efforts were ongoing. This factor weighs in favor of respondent.

### 3. The Extent of Improvements to the Property

GDLP contends that during the 10 years it held the La Jolla property it never built any structures, roads, or dwellings of any kind. Although GDLP never took substantial actions to improve the La Jolla property, it did incur $70,407 of accumulated leasehold improvements as of the end of 2001. Some of these improvements, including a new roof for the building, were more properly characterized as general repairs and maintenance. GDLP argues that the improvements were kept to a minimum, evidenced by the fact the building's heating system and elevator remained in disrepair. On the basis of the leasehold improvements alone, we believe that GDLP never substantially improved the La Jolla property.

### 4. The Frequency, Number, and Continuity of Sales

We have previously held that frequent and substantial sales of real property more likely indicate sales in the ordinary course of business whereas infrequent sales for significant profits are more indicative of real property held as an

[*16] investment. Phelan v. Commissioner, T.C. Memo. 2004-206. Respondent argues that GDLP was in the business of real estate development for sale to consumers.

GDLP had never sold real estate before the sale of the La Jolla property, but other entities that Mr. Fargo owned developed and sold real estate in the normal course of business. However, on these facts we believe GDLP's activity alone should be our focus, and we find this factor favors GDLP. See id., slip op. at 15-20.

### 5. The Extent and Nature of the Transactions Involved

It is undisputed that the sale of the La Jolla property was the only sale associated with this transaction. The property was sold to Centex Homes, an unrelated entity, at a fair price with the plan for Mr. Fargo to develop the property and GDLP to share in the resulting profit according to the terms of the purchase agreement. GDLP and Mr. Fargo were clearly interested in the development profit at the time of the sale. Therefore, this factor favors respondent.

### 6. The Extent of Advertising, Promotion, or Other Active Efforts Used in Soliciting Buyers for the Sale of the Property

It is undisputed that Centex Homes made an unsolicited offer to purchase the La Jolla property, and it is also undisputed that GDLP was not actively

[*17] advertising or promoting its sale around the time it was sold.  The only effort that GDLP made to sell it was contracting with GPC in 1993.

In Maddux Constr. Co. v. Commissioner, 54 T.C. at 1285, the taxpayer similarly discussed a property sale with a real estate broker but did not make any other effort to sell the property.  We held that the taxpayer did not make extensive efforts to sell the property with that action alone.  Here, GDLP did not engage in marketing, selling, or advertising outside of contracting with GPC.  Further, GPC never contacted any buyers or performed substantial marketing or advertising services.  Consequently, GDLP has carried the burden of showing that it did not make extensive efforts to sell the La Jolla property.

### 7. The Listing of the Property With Brokers

The La Jolla property was listed with GPC serving as broker in 1993.  Additionally, the record indicates that GPC was paid a fee based on the sale price.  This factor weighs in favor of GDLP.

### 8. The Purpose for Which the Property Was Held at the Time of Sale

At the time Centex Homes purchased the La Jolla property GDLP had incurred substantial development costs and undertaken several strategic moves to acquire financing to fund development.  At the time of sale GDLP had been continuously increasing its developmental efforts with respect to the La Jolla

[*18] property. During 1999 and 2000 GDLP incurred developmental costs of $233,000 and $216,337, respectively, which represent a substantial portion of the total spent on development over the entire holding period. Unlike the taxpayer in Maddux, which had stopped developing the property two years before the sale, GDLP continually engaged in efforts to plan and develop the La Jolla property up until the purchase date. See id. at 1287. Consequently, this factor would not support the conclusion that the La Jolla property was held simply as an investment at the time of sale.

### 9. Conclusion

Under the factors discussed above, we hold that GDLP sold the La Jolla property in the ordinary course of business under section 1221(a)(1). GDLP purchased and held it primarily to develop it and later sell it to customers. This intent was never abandoned and remained the primary motive for holding the La Jolla property as part of regular business activities. In addition, GDLP incurred significant development expenses. Thus, GDLP has failed to show that gain from the sale of the La Jolla property was not subject to ordinary income treatment under section 1221(a)(1).

We recognize that the La Jolla property was used as a rental property and GDLP and all related entities maintained their offices on the property. However,

[*19] using the La Jolla property as rental property was not GDLP's primary purpose of holding it. We held in Cottle v. Commissioner, 89 T.C. 467 (1987), that section 1231 capital gain treatment was applicable to a rental property subsequently sold to liquidate the investment. That is not the case here. GDLP was making its best use of the La Jolla property as office and rental space while never abandoning its primary intention, selling it.

III. Calculation of Basis in the Property

In general, taxpayers must recognize gain when they sell property for more than its adjusted basis. Sec. 1001(a); sec. 1.61-6(a), Income Tax Regs. Taxpayers may adjust the basis of the property for expenditures, receipts, losses, or other items properly chargeable to the capital account, but they generally bear the burden of proving basis increases they claim. See sec. 1016(a); Rule 142(a); sec. 1.1016-2(a), Income Tax Regs. The burden may shift to the Commissioner if the taxpayer introduces credible evidence supporting a basis increase. See sec. 7491(a)(1). Taxpayers are required to keep sufficient records to substantiate their gross income, deductions, credits, and other tax attributes. Sec. 6001; see also sec. 1.6001-1(a), Income Tax Regs. If taxpayers cannot produce records of actual expenditures affecting basis, we may estimate the amounts of expenses if they

**[*20]** provide credible evidence that establishes a factual basis for the estimate. See Cohan v. Commissioner, 39 F.2d 540 (2d Cir. 1930).

A. Capitalized Development Costs Before 2001

Respondent disallowed $613,060 in capitalized development costs incurred before 2001. GDLP states the development costs were for permits, architects, engineers, and other development activities. These costs were incurred over a number of years in connection with the purchase by FIC of the leasehold interest of La Jolla Medical Building Corp.

Respondent argues the capitalized development costs must be disregarded because too much about the claimed costs is unknown. Many Fargo entities were engaged in several development projects simultaneously. The development at issue, along with the other projects, was managed by a small team of accountants and bookkeepers. Respondent argues that it is likely that mistakes were made in recording expenses on account of the commonality of expenses among the projects and points to the inability of the accountant to explain some of the nomenclature at trial. GDLP argues it provided sufficient evidence to substantiate the capitalized expenses and corroborated the evidence with credible testimony. We agree with GDLP.

**[*21]** After considering the testimony of a bookkeeper and general ledgers kept by GDLP, we find GDLP substantiated the capitalized development costs. We hold that GDLP is entitled to include the capitalized development costs incurred before 2001 in the basis.

B. Interest Paid to GPC

Respondent disallowed $303,057 in interest payments on a developer fee to GPC. Respondent argues that the interest payments were not substantiated and the development agreement between GDLP and GPC was silent as to the payment of the interest and the applicable interest rate. Further, respondent notes that Norby would have approved the interest payment for a number of reasons not related to the validity of the payment. GDLP argues it provided sufficient evidence to substantiate the capital expense entry and that Norby, an unrelated partner, approved the interest payment to GPC.

Considering the evidence, we find that GDLP did substantiate the capital expense. GDLP provided general ledgers, the development agreement, and credible testimony. We do not find it necessary to contemplate the reason Norby approved the interest payment.

**[\*22]** C. <u>Depreciation Allowed or Allowable</u>

Respondent reduced the basis of the La Jolla property by $878,613 for depreciation allowed or allowable. Depreciation is allowed for property used in a trade or business and property held for the production of income. Sec. 167. A leasehold of land used in a trade or business may be property of a character which is subject to the allowance for depreciation provided in section 167. <u>See</u> <u>Century Elec. Co. v. Commissioner</u>, 192 F.2d 155, 160 (1951), <u>aff'g</u> 15 T.C. 581 (1950); <u>Fackler v. Commissioner</u>, 133 F.2d 509, 512 (1943), <u>aff'g</u> 45 B.T.A 708 (1941); <u>City Nat'l Bank Bldg. Co. v. Helvering</u>, 98 F.2d 216, 219 (1938), <u>aff'g</u> 34 B.T.A. 93 (1936); <u>Baker v. Commissioner</u>, 38 T.C. 9, 12 (1962). Section 178 provides rules for determining the amount of depreciation or amortization deduction allowable to a lessee for both the cost of acquiring a lease and for improvements made on leased property. Sec. 178; sec. 1.178-1, Income Tax Regs. Respondent argues that GDLP's basis in the La Jolla property should be reduced by the depreciation allowable for the term of the lease. This is a factual question.

FIC acquired its leasehold interest in December 1988. The lease had a term ending August 31, 2008. The lease was actually terminated when GDLP purchased a fee simple interest in the property on December 31, 1997. The issue was not clearly framed by the FPAA or the pleading, and we find it is a "new

[*23] matter" under Rule 142(a)(1), such that respondent bears the burden of proof.

The record before us understandably is not clear on the circumstances from December 1988 until December 31, 1997. The facts necessary to establish whether depreciation was allowed or allowable are not in the record. Therefore, we will not presume these facts favorable to respondent, and we do not uphold this adjustment to basis.

### D. Adjustments Petitioners Did Not Address on Brief

Respondent disallowed GDLP's loan interest payment of $108,531 to GPC and an unexplained difference of $518,861 between respondent's determination of basis and the basis GDLP claimed on its Form 1065, U.S. Return of Partnership Income, for 2002. Adjustments not addressed in any of petitioners' briefs are deemed to be conceded. See Rybak v. Commissioner, 91 T.C. 524, 566 (1988). We therefore hold that GDLP's basis must be reduced by these amounts.

## IV. Validity of Deductions Characterized as Ordinary and Necessary Business Expenses

Deductions are a matter of legislative grace, and taxpayers must maintain sufficient records to substantiate the amounts of their income and entitlement to any deductions or credits claimed. Rule 142(a)(1); INDOPCO, Inc. v.

[*24] Commissioner, 503 U.S. at 84; New Colonial Ice Co. v. Helvering, 292 U.S. 435, 440 (1934). A taxpayer may deduct ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. Sec. 162. Whether an expense is ordinary is determined by time, place, and circumstance. Welch v. Helvering, 290 U.S. at 113-114. Where a taxpayer reports a business expense but cannot fully substantiate it, the Court generally may approximate the allowable amount. Cohan v. Commissioner, 39 F.2d 540 at 543-544. However, we may do so only when the taxpayer provides evidence sufficient to establish a rational basis upon which an estimate can be made. Vanicek v. Commissioner, 85 T.C. 731, 743 (1985).

Respondent disallowed GMC's deductions totaling $1,306,000 which flowed through to Ms. King on the basis that the fees were not ordinary and necessary business expenses. These deductions were made up of a $350,000 real estate commission fee to KRE, a $456,000 development fee to GPC, and a $500,000 development fee to FIC. Fargo and King argue that these expenses were ordinary and necessary as compensation for services performed by the entities under contractual agreements.

Fargo and King failed to prove that these expenses were ordinary and necessary business expenses. Fargo and King cite no evidence that the related

[*25] entities were entitled to the commission fee and development fees received. The contracts GDLP had with GPC and FIC were for marketing services, yet the La Jolla property was not being actively marketed. Further, there is no evidence that KRE was entitled to a commission fee over the $520,000 fee KRE received at the close of escrow. Even if we found the expenses to be ordinary and necessary, Fargo and King failed to substantiate them. The amounts of the deductions were not supported by the contracts, and Fargo and King could not recall during trial how the payments were calculated. We are unable to approximate the allowable deductions on account of the lack of sufficient evidence.

Further, GMC paid the fees as the general partner of GDLP for contracts and fees that GDLP would have been liable for. A partner cannot directly deduct the expenses of the partnership unless there is an agreement among the partners that such expenses shall be borne by the partner individually out of its own funds. See Deputy v. du Pont, 308 U.S. 488, 494 (1940); Welch v. Helvering, 290 U.S. at 114-115; Cropland Chem. Corp. v. Commissioner, 75 T.C. 288 (1980). The partnership agreement held GMC, as the general partner, liable for costs when income and assets of GDLP were insufficient. GDLP had sufficient funds to pay the fees. There was no agreement between GMC and GDLP for GMC to pay the

[*26] fees, aside from the partnership agreement. Therefore, GMC cannot deduct the trade or business expenses of GDLP under the general rule.

The exception to this general rule applies upon the satisfaction of a two-prong test: (1) whether the taxpayer's purpose or motive for paying the obligation of the other entity is to protect or promote the taxpayer's own trade or business; and (2) whether the expenditure is an ordinary and necessary expense of the taxpayer's own trade or business. Lohrke v. Commissioner, 48 T.C. 679, 688 (1967); Dietrick v. Commissioner, T.C. Memo. 1988-180, aff'd, 881 F.2d 336 (6th Cir. 1989).

Fargo and King do not satisfy both prongs of the test. As stated above, GMC's expenditures were not an ordinary and necessary expense of its own trade or business. Fargo and King made no argument regarding their purpose or motive for GMC's payment of GDLP's obligation. Even if the purpose or motive was to protect or promote GMC's own trade or business, Fargo and King would still fail the two-prong test as the expense was not ordinary and necessary. Accordingly, we agree with respondent that the expenses are not deductible.

V. Whether GMC's Claimed Deductions Are Distributions to Ms. King

A party may not raise a new issue on brief where consideration of the issue would surprise or prejudice the opposing party. See Smalley v. Commissioner,

**[\*27]** 116 T.C. 450, 456 (2001); <u>508 Clinton St. Corp. v. Commissioner</u>, 89 T.C. 352, 353 n.2 (1987).

Fargo and King argue, for the first time in the posttrial brief, that if we find the deductions discussed <u>supra</u> part IV are not ordinary and necessary business expenses then they are distributions to Ms. King.  The parties did not pursue facts or evidence that may bear on this issue.  Accordingly, we will not address this argument.

VI.  <u>Appropriate Adjustment to Net Operating Loss</u>

Taxpayers attempting to deduct a net operating loss (NOL) bear, in particular, the burden of establishing both the existence of the NOL and the amount of any NOL that may be carried over to the subject years.  Rule 142(a)(1); <u>United States v. Olympic Radio & Television, Inc.</u>, 349 U.S. 232, 235 (1955); <u>Keith v. Commissioner</u>, 115 T.C. 605, 621 (2000).  Such deductions are a matter of legislative grace, not a matter of right.  <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. at 84; <u>Olympic Radio & Television, Inc.</u>, 349 U.S. at 235; <u>Deputy v. du Pont</u>, 308 U.S. at 493.

Notwithstanding the general rule, if the taxpayer produces credible evidence with respect to any factual issue relevant to ascertaining his Federal income tax liability, the burden of proof shifts from the taxpayer to the Commissioner as to

[*28] that factual issue. Sec. 7491(a)(1). The shifting of the burden of proof, however, is conditioned upon the taxpayer's first demonstrating that he met the requirements of section 7491(a)(2), including (1) substantiating any item as required by the Code, (2) maintaining all records required by the Code, and (3) cooperating with the Commissioner's reasonable requests for witnesses, information, documents, meetings, and interviews.

Respondent argues that Fargo and King's NOL for 2002 should be reduced by $150,669. Respondent determined, on the basis of review of Fargo and King's 2002 Form 1040, that Fargo and King were entitled to deduct only $56,100 of the $131,122 mortgage interest and none of the $75,647 investment interest claimed for 2001 for purposes of determining how much of the existing NOL was absorbed in 2001. Fargo and King failed to substantiate any of the mortgage interest or investment interest payments reported on their 2001 return. We agree with respondent that Fargo and King's 2001 NOL should have absorbed $150,669 of the remaining NOL, reducing the available NOL for 2002 by the same amount.

VII. Deduction for Home Mortgage Interest

The general rule is that "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." Sec. 163(a).

[*29] Deductions are a matter of legislative grace, and a taxpayer bears the burden of proving entitlement to any claimed deductions. Rule 142(a)(1); INDOPCO, Inc. v. Commissioner, 503 U.S. at 84. The taxpayer bears the burden of proving, by a preponderance of the evidence, that the determinations of the Commissioner in a notice of deficiency are incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. at 115.

For cash method taxpayers, a mortgage interest deduction requires that mortgage interest be paid in cash or its equivalent. Don E. Williams Co. v. Commissioner, 429 U.S. 569, 578-579 (1977); Eckert v. Burnet, 283 U.S. 140, 141 (1931); Menz v. Commissioner, 80 T.C. 1174, 1185 (1983). A promissory note is generally not considered to be the equivalent of cash but merely a promise to pay. Helvering v. Price, 309 U.S. 409, 413 (1940); Nat Harrison Assocs., Inc. v. Commissioner, 42 T.C. 601, 624 (1964). If the obligation to pay mortgage interest is satisfied through the issuance of notes to the same lender to whom the mortgage interest is owed, there has been no payment of mortgage interest; rather, payment has merely been postponed. Davison v. Commissioner, 107 T.C. 35, 41 (1996), aff'd, 141 F.3d 403 (2d Cir. 1998); Stone v. Commissioner, T.C. Memo. 1996-507.

[*30] Fargo and King argue that they calculated the mortgage interest using a fraction with the qualified mortgage debt as the numerator and the outstanding principal on the underlying loans as the denominator. Fargo and King used an amount for the qualified mortgage debt that was greater than the stipulated amount. Additionally, Fargo and King disregarded the implications of refinancing a loan with the same lender.

Respondent argues that Fargo and King claimed a larger home mortgage interest deduction on their 2002 Form 1040 than they are entitled to. In 2002 Fargo and King refinanced one loan for $1,470,000 with a loan for $1,590,000 from the same lender. The increase in the loan amount was partially attributable to negative amortized interest from the first loan. The negative amortized interest paid through refinancing must be disregarded in computing the allowable deduction. The parties stipulated that Fargo and King are limited to total qualified mortgage debt of $950,000; therefore, the total amount of interest paid on the larger loan must be adjusted accordingly.

We agree with respondent's determination in the notice of deficiency that Fargo and King's mortgage interest should be adjusted from $141,681 to $56,100.

**[*31]** VIII.  Deduction for Investment Interest

Investment interest generally means "any interest * * * which is paid or accrued on indebtedness properly allocable to property held for investment."  Sec. 163(d)(3)(A).  Investment interest excludes qualified residence interest.  Sec. 163(d)(3)(B)(i).  For noncorporate taxpayers, investment interest is deductible only to the extent of the taxpayer's net investment income for the taxable year.  Sec. 163(d)(1).

Respondent disallowed all of Fargo and King's $49,097 investment interest deduction.  Fargo and King claim the investment interest was paid on the debt secured by their principal residence.  Fargo and King argue that a portion of the loan proceeds was lent to related entities and interest income was earned on those loans.  Fargo and King have failed to establish that they had investment income against which to offset interest expenses through any contracts, agreements, promissory notes, or other evidence of bona fide investment activities.  Accordingly, we agree with respondent that the investment interest deduction should be disallowed.

IX.  Accuracy-Related Penalty

Section 6662(a) and (b)(1) and (2) imposes a 20% accuracy-related penalty if any part of an underpayment of tax required to be shown on a return is due to,

[*32] among other things, negligence or disregard of rules or regulations or a substantial understatement of income tax. The penalty is 20% of the portion of the underpayment of tax to which the section applies. Sec. 6662(a).

The Commissioner bears the burden of production on the applicability of an accuracy-related penalty in that he must come forward with sufficient evidence indicating that it is proper to impose the penalty. See sec. 7491(c); see also Higbee v. Commissioner, 116 T.C. 438, 446 (2001). Once the Commissioner meets this burden, the burden of proof remains with the taxpayer, including the burden of proving that the penalty is inappropriate because of reasonable cause and good faith. See Higbee v. Commissioner, 116 T.C. at 446-447.

The Commissioner satisfies his burden of production by showing that the understatement meets the definition of "substantial". See Janis v. Commissioner, T.C. Memo. 2004-117, aff'd, 461 F.3d 1080 (9th Cir. 2006), and aff'd, 469 F.3d 256 (2d Cir. 2006). An understatement of income tax is "substantial" if it exceeds the greater of 10% of the tax required to be shown on the return or $5,000. Sec. 6662(d)(1)(A). An "understatement" is defined as the excess of the tax required to be shown on the return over the tax actually shown on the return, less any rebate. Sec. 6662(d)(2)(A). The understatement of income tax in docket No. 28970-11 is $322,064, which exceeds 10% of the tax required to be shown on the return, which

**[\*33]** is greater than $5,000 and is thus "substantial". Respondent has therefore met his burden of production.

The amount of an understatement shall be reduced by that portion of the understatement which is attributable to: (1) the tax treatment of any item by the taxpayer if there is or was substantial authority for such treatment or (2) any item if the taxpayer adequately disclosed relevant facts affecting the item's tax treatment in the return or in a statement attached to the return and there is a reasonable basis for the tax treatment of the item by the taxpayer. Sec. 6662(d)(2)(B).

Fargo and King argue that the accuracy-related penalty does not apply because they meet the reasonable cause defense of section 6664(c)(1). Pursuant to that section, an accuracy-related penalty under section 6662 does not apply to any portion of an underpayment for which a taxpayer establishes that he or she: (1) had reasonable cause and (2) acted in good faith. Whether a taxpayer has acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including efforts to assess the proper tax liability, the taxpayer's knowledge and experience, and the extent to which the taxpayer relied on the advice of a tax professional. Sec. 1.6664-4(b)(1), Income Tax Regs. "Generally,

**[*34]** the most important factor is the extent of the taxpayer's effort to assess the taxpayer's proper tax liability." Id.

Although Fargo and King claim to have followed the advice given to them by their tax adviser, they have made no attempt to establish that their reliance was reasonable. See Freytag v. Commissioner, 89 T.C. 849, 888 (1987), aff'd on another issue, 904 F.2d 1011 (5th Cir. 1990), aff'd, 501 U.S. 868 (1991); sec.1.6664-4(b)(1), Income Tax Regs. We have previously held that

> for a taxpayer to rely reasonably upon advice so as possibly to negate a section 6662(a) accuracy-related penalty determined by the Commissioner, the taxpayer must prove * * * that the taxpayer meets each requirement of the following three-prong test: (1) The adviser was a competent professional who had sufficient expertise to justify reliance, (2) the taxpayer provided necessary and accurate information to the adviser, and (3) the taxpayer actually relied in good faith on the adviser's judgment.

Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 99 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Fargo and King have failed to prove that they satisfied any of these three requirements.

Fargo and King have failed to prove they meet the reasonable cause defense of section 6664(c)(1). As a result, we hold them liable for the 20% accuracy-related penalty.

**[*35]** To reflect the foregoing,

<u>Decisions will be entered under</u>

<u>Rule 155</u>.